[Civ. No. 48706. Second Dist., Div. Two. Mar. 15, 1977.]

ALLIED ARTISTS PICTURES CORPORATION,
Plaintiff and Appellant, v.
DAVID FRIEDMAN, Defendant and Appellant.

130

**COUNSEL**

Dern, Mason, Swerdlow & Floum and Richard H. Floum for Plaintiff and Appellant.

Fleishman, Brown, Weston & Rhode and Stanley Fleishman for Defendant and Appellant.

**OPINION**

**COMPTON, J.**—In the early 1950s, a book entitled "Histoire d'O" was published in France. Plaintiff Allied Artists Pictures Corp. (Allied) euphemistically describes the book as a "worldwide classic of erotic literature." An English translation of the book has been widely distributed in the United States since 1965 by Grove Press, Inc. (not a party to this action) under the title "The Story of O."

In early 1975, a film based on the book and entitled "Histoire d'O" was produced in France. At about the same time production was commenced in the United States of a low budget film entitled "The Journey of O". The latter is not based on the book and from what appears in the record there is no similarity to the film "Histoire d'O" except for its admitted theme of sexual exploitation and the fact that the principal character in each film is called "O."

Following its release in mid-1975, the film "Histoire d'O" was widely advertised, distributed and viewed in France. As early as September 1975, the film was the subject of reviews in major United States publications such as Newsweek and Time Magazines.

In the meantime, however, defendant David Friedman, doing business as Equal Opportunities, Inc., in August of 1975, obtained the distribution rights to the American made "The Journey of O" and shortly thereafter the film was playing at theatres in Chicago, Illinois, and Charlotte, North Carolina.

Later, in October of 1975, Allied acquired the United States distribution rights to the French-made film "Histoire d'O." It paid $400,000 for these rights. Allied embarked on a massive advertising and promotional campaign. The film opened in the United States in a theatre in New York City in November of 1975 under the English translated title "The Story of O." It was apparently well attended and well received by reviewers.

On December 2, 1975, Allied commenced an action in the Superior Court of Los Angeles County, the county of defendant's residence and

place of business. Allied's complaint alleged that defendant's use of the title "The Journey of O" amounted to unfair competition in that the title was confusingly similar to Allied's title and was calculated to deceive the public into believing that "The Journey of O" was "The Story of O." Allied sought a temporary and permanent injunction preventing defendant from using the title "The Journey of O" or any other "confusingly similar title."

In support of its petition for a preliminary injunction Allied filed a declaration by Mr. Peter Strauss, executive vice-president of Allied. Strauss stated that the title "The Story of O" had acquired a secondary meaning in the minds of the public connecting the title with the book being distributed in the United States by Grove Press, Inc. and that "numerous movie going patrons will go to see the picture because it bears the same title as the book."

Strauss further declared that as of the time of the filing of the action the picture had been widely acclaimed and on the basis of its success in New York had received approximately $1 million in advance bookings and was scheduled to open in 35 to 40 first-run theaters throughout the United States.

Allied's investment up to that point was $250,000 in advertising in addition to the $400,000 paid for the distribution rights. Another $200,000 was projected for additional prints of the film and $1.5 million for future advertising.

The trial court after a hearing based upon opposing written declarations and oral argument declared that Allied had established a secondary meaning "between that certain French motion picture concerning which plaintiff has the American distribution rights to and the English title to said motion picture, to wit, "The Story of O" "and that the title of defendant's picture "The Journey of O" was "confusingly similar."

Based on that conclusion the trial court issued a temporary injunction which required defendant in California to include in all of its advertisements, including promotional "trailers," the phrase "not to be confused with Allied Artists Pictures' 'The Story of O'."

Defendant appealed from the order, Allied cross-appealed, contending that the injunction should extend beyond the boundaries of California and should require defendant to change the name of his film.

The defendant's contentions can be summarized as follows.

(1) That the English translated title "The Story of O" had acquired no secondary meaning in the United States in relation to the film, and

(2) In any event Allied who was merely a distributor, albeit an exclusive distributor, failed to establish that its distribution rights included "property rights" in the title.

Taking up defendant's latter contention first, his reliance on the concept of a property right is misplaced. Allied does not and indeed cannot rest its claim on a theory of appropriation of a property right in the title.

As we pointed out in *Tomlin* v. *Walt Disney Productions*, 18 Cal.App.3d 226, at page 234 [96 Cal.Rptr. 118], the state's power to protect literary titles, which are not afforded protection by federal copyright laws, cannot be based on any theory of appropriation of a property right. The gravamen of the action is unfair competition. A title of a literary product is, like a label on other types of products, simply a means of identifying a product.

As was stated in *Curtis* v. *20th Century-Fox Film Corp.*, 140 Cal.App.2d 461, at page 469 [295 P.2d 62], and quoted by us in *Tomlin* at page 230, " 'Anyone may use a title if there is no secondary significance. Unfair competition consists in palming off one's goods as those of another. The mere use of a substantially similar title, if not used in such manner as to induce the public to believe that the work to which it is applied is the identical thing which it originally designated, does not constitute unfair competition.' "

On the other hand a state may protect a business in the use of trademarks or labels by requiring that appropriate steps be taken to prevent the consumer from being misled as to the content or source of the product. (*Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U.S. 225 [11 L.Ed.2d 661, 84 S.Ct. 784].)

■ Allied, by virtue of its exclusive right to market the film in question in the United States, has a property right in the film sufficient to entitle it to protection against unfair competition. (Compare *Metro-Goldwyn-Mayer, Inc.* v. *Lee,* 212 Cal.App.2d 23 [27 Cal.Rptr. 833].) That right includes protection against the use of deceptive or misleading titles. ■ The available protection in the area of titles is "limited . . . to a narrowly drawn injunction requiring appropriate precautions to prevent public confusion . . . ." (*Tomlin* v. *Walt Disney Productions, supra,* at p. 235.)

■ Of course the *sine qua non* of Allied's claim of unfair competition in the use of the title "The Journey of O" is establishing that the title "The Story of O" had acquired a secondary meaning of identification with its film. (*Jackson* v. *Universal Internat. Pictures,* 36 Cal.2d 116 [222 P.2d 433].) Contrary to defendant's claim the necessary identification is with the literary work, the film, and not with Allied as the distributor. (See 23 A.L.R.2d 302; *Jackson* v. *Universal Internat. Pictures, supra.*)

It is undisputed that the film which Allied is distributing is the French film based on the book "Histoire d'O." It is further undisputed that the title "Histoire d'O" enjoyed a secondary meaning in France in that it was widely identified with the basic story and thus it was understood by the public that the title identified either the book or its film version. The title "The Story of O" is nothing more than the anglicization of "Histoire d'O".

Further defendant does not seriously dispute the fact that the title "The Story of O" acquired a secondary meaning in connection with the book distributed by Grove Press, Inc. In other words, that element of United States society that reads such material associated the title "The Story of O" with the English translation of "Histoire d'O."

■ The question of whether a particular title has acquired a secondary meaning is one of fact. (*Metro-Goldwyn-Mayer, Inc.* v. *Lee, supra; Johnston* v. *20th Century-Fox Film Corp.,* 82 Cal.App.2d 796 [187 P.2d 474].) There is substantial evidence in the record to support the trial court's finding that the wide dissemination of the book by Grove Press, Inc., coupled with the publicity that the film had received from major publications in the United States, created in the minds of those persons who would patronize such films the understanding that "The Story of O"

was the French-made film based upon that specific and well-known erotic novel.

■ It is unimportant that the secondary meaning resulted from the activities of persons other than Allied. (*Metro-Goldwyn-Mayer, Inc.* v. *Lee, supra; Jackson* v. *Universal Internat. Pictures; supra; Goldman* v. *RKO Radio Pictures, Inc.,* 149 Misc. 226 [267 N.Y.S. 280]; *United Artists Corp.* v. *Exodus Motion Picture Corp.,* 26 Misc.2d 807 [207 N.Y.S.2d 465].) The critical question is whether the secondary meaning had been established in the public mind and not the precise manner in which it was created. Defendant's assertion that Allied could only benefit from a secondary meaning which is attributable to its own activities reflects defendant's misconceived notion of the importance of the concept of property right.

The result is not altered by the fact that defendant's film was released in the United States prior to Allied's release of its film. Priority of use of a title does not of itself create a secondary meaning. (*Gordon* v. *Warner Bros. Pictures, Inc.,* 269 Cal.App.2d 31 [74 Cal.Rptr. 499].)

The issue remaining to be resolved is raised by both the appeal and the cross-appeal and that is to what relief if any is Allied entitled. This issue really embraces four questions.

(1) Under the present state of the law is a plaintiff entitled to injunctive relief where defendant is using a title similar to but different from the one in which plaintiff has established a secondary meaning?

(2) Does defendant's title here amount to unfair competition?

(3) Can the injunction require defendant to change his title?

(4) May a state court issue an injunction which reaches beyond the territory of the state?

In *Tomlin* v. *Walt Disney Productions, supra,* we had occasion to analyze the effect on an action for unfair competition of Congress' failure to provide for copyrighting of literary titles. We were persuaded by the United States Supreme Court decisions in *Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U.S. 225 [11 L.Ed.2d 661, 84 S.Ct. 784], and *Compco Corp.* v. *Day-Brite Lighting,* 376 U.S. 234 [11 L.Ed.2d 669, 84 S.Ct. 779] (cases dealing with unpatentable items) that a state could not under the

guise of preventing unfair competition, prevent the copying of a literary title.

We held in that case that unfair competition in the use of titles could be prevented by an injunction which required appropriate precautions to prevent public confusion. ■ There we were dealing with the copying of the exact title, but reason suggests that public confusion can arise from the use of similar though somewhat different titles. (See for example *Family Record Plan, Inc.* v. *Mitchell,* 172 Cal.App.2d 235 [342 P.2d 10], where confusion was found between plaintiff's business and defendant's Family Album Plan.)

The likelihood of public confusion will warrant relief. (Civ. Code, § 3369; *Gordon* v. *Warner Bros. Pictures, Inc., supra*; *Brooks Bros.* v. *Brooks Clothing Co. of California,* 60 F.Supp. 442.) In the case at bench at least one instance of actual confusion was shown where Daily Variety, a highly respected trade publication, reported "The Journey of O's" earnings as those of Allied's "The Story of O."

The question of the likelihood of public confusion is a question of fact. (*Ball* v. *American Trial Lawyers Assn.,* 14 Cal.App.3d 289 [92 Cal.Rptr. 228].) The trial court here resolved that issue in favor of Allied on the basis of substantial evidence. We will not disturb that finding.

■ The trial court correctly required defendant to take reasonable steps to dispel the likelihood of confusion by including disclaimers in its advertising. ■ Contrary to Allied's contention the trial court could not require defendant to change the title. (*Tomlin, supra,* at p. 235.)

Finally it appears from the transcript of the hearing that the trial court was of the opinion that it lacked authority to make the injunction apply to advertising outside of California even though the evidence disclosed that the two films were being promoted and distributed throughout the United States. ■ We are of the opinion that the injunction could properly apply nationwide. (See *Jackson* v. *Universal Internat. Pictures,* 36 Cal.2d 116 [222 P.2d 433].)

Allied established that its title "The Story of O" had acquired a secondary meaning and that it was entitled to protection nationwide. Allied's evidence of its proposed promotional scheme was extensive.

█ "[I]n accordance with the general rule, . . . that a court of equity having jurisdiction of the person of defendant may render any appropriate decree acting directly on the person, even though the subject matter affected is outside the jurisdiction, a court having jurisdiction of the parties may grant and enforce an injunction, although the subject matter affected is beyond its territorial jurisdiction, or requires defendant to do or refrain from doing anything beyond its territorial jurisdiction which it could require him to do or refrain from doing within the jurisdiction." (43 C.J.S., Injunctions, § 168, p. 795.) (See also Witkin, Cal. Procedure (2d ed.) Jurisdiction, §§ 146, 147; *People* ex rel. *Mosk* v. *National Research Co. of Cal.,* 201 Cal.App.2d 765, 766 [20 Cal.Rptr. 516]; *Mills* v. *Mills,* 147 Cal.App.2d 107, at pp. 116, 117 [305 P.2d 61].)

█ The issuance of a preliminary injunction is addressed to the sound discretion of the trial court. (*Christensen* v. *Tucker,* 114 Cal.App.2d 554 [250 P.2d 660]; *Schofield* v. *Bany,* 175 Cal.App.2d 534 [346 P.2d 891].) █ One consideration concerning the propriety of an injunction with extraterritorial impact is whether it creates a conflict with the laws of another jurisdiction. (*Steele* v. *Bulova Watch Co.,* 344 U.S. 280 [97 L.Ed. 319, 73 S.Ct. 252].) Nothing was presented to the trial court or to this court which suggests that the action which the trial court directed the defendant to take would conflict with the laws of any other United States jurisdiction.

The record indicates that the trial court did not view the matter as one of discretion but instead concluded that it lacked the authority to issue a broader injunction. Hence we return the matter to the trial court for further consideration. (*Jackson* v. *Jackson,* 51 Cal.App.3d 363 [124 Cal.Rptr. 101]; *People* v. *Robarge,* 41 Cal.2d 628 [262 P.2d 14]; *Lippold* v. *Hart,* 274 Cal.App.2d 24 [78 Cal.Rptr. 833].)

The order of the trial court is affirmed insofar as it pertains to defendant's conduct in California. The matter is remanded for further consideration of the issue of whether the order should be made to apply nationwide. Allied to recover costs of the appeal and the cross-appeal.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied April 4, 1977, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied May 12, 1977.